ROBBINS v. BROWNVILLE PAPER CO.

(Supreme Court, Appellate Division, Fourth Department. July 24, 1900.)

1. MASTER AND SERVANT—DEATH OF SERVANT—UNCOVERED FLUME—CONTRIBUTORY NEGLIGENCE—EVIDENCE.

A servant, while going to clear ice from a flume rack, fell into an open space between two platforms over the flume, and was drowned. On the same night the servant had assisted his brother in clearing away the ice, and had assisted in performing such duty as occasion required for three years. He was familiar with the flume and its dangerous character, knew the method of clearing away ice, and had full opportunity to know the exact situation. He was provided with a lantern, and it was a bright, moonlight night. While the evidence tended to show that such open space had been habitually covered until within a week or ten days before the accident, there was no proof that it had been covered within such time, or that such servant did not know the exact situation, or that he took any precaution to prevent the accident. *Held*, that freedom from contributory negligence was not established.

2. SAME—ACTIONABLE NEGLIGENCE—RISKS OF EMPLOYMENT—KNOWLEDGE OF DEFECT.

Evidence showed that such open space had been covered by unsecured planks until within a week or ten days of the accident, but did not show when or how they were removed, or that the master knew, or should have known, of their removal. *Held*, that no recovery could be had, since the obvious risks of the employment were assumed by the servant, and actionable negligence of the master was not shown.

Appeal from trial term, Jefferson county.

Action by Della A. Robbins, as administratrix of the estate of James Robbins, deceased, against the Brownville Paper Company. From a judgment in favor of the plaintiff, and from an order denying a motion for a new trial, defendant appeals. Reversed.

The action was commenced on the 18th day of March, 1899, to recover damages for the alleged negligence of the defendant in causing the death of one James Robbins, the plaintiff's husband and intestate, who was drowned in the flume of the defendant's mill, in Brownville, in the county of Jefferson, N. Y., during the night of December 29, 1898.

Argued before ADAMS, P. J., and McLENNAN, SPRING, WILLIAMS, and LAUGHLIN, JJ.

Henry Purcell, for appellant.
N. F. Breen, for respondent.

McLENNAN, J. Two questions are presented by this appeal: First. Is there any evidence to support the finding of the jury that plaintiff's intestate was free from contributory negligence? Second. Is there sufficient evidence to establish actionable negligence on the part of the defendant?

The defendant, a domestic corporation, at the time of the accident, and for several years prior thereto, was engaged in operating by water power a paper mill situate on Black river, in Jefferson county, N. Y., the water being taken from the river to the mill by means of a flume. Within the main flume, and extending southerly from the mill, was a branch flume, into which the water passed, consisting of a framework rising several feet above the surface of the water in the main flume. It was located in the northeasterly corner, was 18 feet wide on the south end, extended northerly for a distance of about 26 feet, where it was intersected by the main flume, and from there extended to the wheels of the mill, and through it all the water passed which reached the mill. On the southerly end and westerly side of the branch flume were racks, which consisted of heavy timbers or scantlings set upright, a few inches apart, extending from the bottom to the top of the framework. Next to the southerly rack, and on a level with the racks and top of the framework, was an upper platform, 9 feet wide, extending the entire width of the flume. Connecting with such platform at the easterly end there was a walk 3 feet wide, which extended along the easterly side of the flume to the mill. Where it joined the platform, and for some distance towards the mill, the walk was on a level with the platform. It then raised 2 feet 6 inches, to the level of another platform, which was reached by three steps; then descended 3 feet 6 inches, to the level of still another platform, which was substantially on a level with the floor of the mill, and which was reached by five steps. Next to the upper platform, and extending from the walk to the westerly rack and side of the branch flume, there was at the time of the accident an open space 2 feet 6 inches wide. Next north of this open space was a platform 6 feet 6 inches wide, and 3 feet lower than the upper platform and walk. Next north of the lower platform, but 3 feet above it, was a timber or beam, called a "cap," 12 inches in width, which extended from the westerly side of the rack to the westerly side of the walk. There was, then an open space of 2 feet 2 inches in width; then another cap, another open space, and so on until the point where the main flume intersected the branch flume was reached. The racks above mentioned were for the purpose of keeping large pieces of ice, called "anchor ice," and other obstructions, from reaching the water wheels of the mill. In freezing weather anchor ice and other obstructions would form a dam against the racks, and impede the flow of water onto the wheels. To obviate this difficulty it was necessary from time to time to rake the racks, which was done by prying away the ice which accumulated about the racks, and making openings in it to permit the water to flow through the racks freely. Raking was done at the southerly rack by men standing on the high platform, who with a bar or heavy lever would reach down on the outside of the branch flume under the ice, and pry it loose. To remove the ice from the westerly rack the defendant's

employés would stand upon the caps above mentioned, which were on a level with the top of the rack, and from there reach over the outside, get their pry or lever under the ice, and pry it away. To move the accumulated ice it was necessary to get a pry under it, and to do that the men had to stand on a level with the top of the rack. It therefore was not feasible to do the work, or any portion of it, while standing upon the lower platform, so called, which was 3 feet lower than the top of the racks, and 3 feet lower than the walk and upper platform. A person in defendant's mill desiring to engage in raking ice would start upon the walk extending along the easterly side of the branch flume, proceed southerly until the first or some one of the other caps extending from the walk to the westerly rack was reached; then cross the flume to the westerly rack, if raking was to be done there, or continue along the walk until the high platform next to the southerly rack was reached, from which that rack could be raked. Concededly, ice could only be raked from the westerly rack by standing upon one of the caps which extended from the walk to such rack, and ice could only be raked from the southerly rack by standing on the high platform which was at the same elevation as the caps. As we have seen, at the time of the accident there was an open space 2 feet 2 inches in width next north of the high platform, and which open space extended from the westerly rack to the walk. Next north of this open space was the lower platform, 6 feet 2 inches wide, and 3 feet lower than the upper platform, the walk, and the caps. The plaintiff's intestate had been employed by the defendant as pulp maker continuously for the period of three years prior to the accident. It was a part of his duty to assist in raking ice, and this he did during the entire time of his employment, whenever necessary. He was entirely familiar with the flume, its construction, and the method of performing the work of clearing the racks. On the night in question the deceased and his brother commenced work in the mill about 6 o'clock in the evening. The ice was in such condition that it was necessary to remove it from the racks from time to time during the night. The plaintiff's intestate and his brother worked together removing ice from the west rack at different times during the early part of the night,—in all, about an hour. The brother of the deceased testified that the night "was a light one. There was a full moon. It was one of those bright, cold nights, with the mercury, I think, below zero." Lanterns were also provided for the use of the men while engaged in raking ice. While the two brothers were working together upon the night of the accident, they did not stand or go upon the high platform or upon the lower platform, but stood upon the caps, and were engaged in removing the ice from the west rack, north of the lower platform, that being the only place where the ice gave trouble that night. The brother of the deceased, from whose testimony proof of freedom from contributory negligence on the part of the deceased must be found, if it exists, testified:

"The ice which bothered was by the main flume, lying against the west rack of the defendant's flume. It was that ice over in the main flume which was troublesome. I tried to raise the ice up which was in the main flume outside, so as to let the water under it. That was one way of doing the work; that is, you would poke up the ice which stood in the main flume outside of

the west rack so the water would flow under it. That was the principal work
we did. When doing this work we would stand all along at the rack, clear
back. We had the timbers to stand on. This platform three feet high we did
not stand on. We stood on it when we were raking the south rack. We
pushed the ice from these racks from the main flume. We did not work on
the high platform that night. Where we worked that night, we were working
to get the ice from the rack west of the lower platform. When doing that
we did not stand on the lower platform. We could not stand on that platform
and poke ice from under the rack, but stood over on the further side."

The witness further says that a man could not stand on the lower
platform and rake the rack on the west side, because he would not be
up high enough.

About 2 or 3 o'clock on the night in question the plaintiff's intestate
informed his brother that he was going out on the flume to rake ice.
A few minutes after the brother went out to find him or aid him, and
found that he was missing. Search was made, and there is evidence
tending to show that a hole was discovered in thin ice which had
formed over the open space between the high and low platforms, of
sufficient size to admit the body of a man. The mitten of the deceased
was found on the lower platform, 5 or 6 feet from the hole, and his
raking spud was found near the hole; the upper end leaning against
the upper platform, and the lower end upon the lower platform. The
body of the deceased was found at the north end of the flume next to
the mill.

The contention of the plaintiff is, and it is supported by the evi-
dence of the brother of the deceased, that during the time the deceased
had worked for the defendant (at least, until within a week or a week
and a half before the accident) the open space between the upper and
lower platforms, in which the hole in the ice was discovered, had been
invariably covered with plank; but whether such space was so covered
on the night in question, when the deceased and his brother were en-
gaged in raking ice, or whether such hole had been covered for the
space of a week or a week and a half prior to the accident, or what
knowledge the deceased had of the condition of the opening between
the platforms immediately prior to the accident, or what its condition
actually was, no one pretends to state. After the accident an exam-
ination was made about the open space in question, and two loose
planks were discovered lying on the edge of the lower platform; and
the plaintiff contends that those planks had habitually covered the
open space, but were unnailed or unsecured, and because of that fact
were removed from their place by the rise of the water in the flume
and floated to one side, thus leaving the space open, and that the
plaintiff's intestate, believing that the planks were in place and that
there was no open space there, walked into it and met his death.
There is no evidence tending to show that on the night of the accident
the water in the flume rose sufficiently to float the planks out of place,
in case they were used for covering the opening, as claimed by the
plaintiff, or that the water rose at all. The evidence does not show
how the planks were moved, if they were moved; that they were
moved with the knowledge or consent of the defendant; or that they
had been out of place for such length of time that the defendant, in
the exercise of ordinary care and prudence, should have known it.

As before said, no witness states that the planks or any other covering was over or upon the open space in question for a week or a week and a half prior to the accident. No one was present or on the flume with the deceased when the accident occurred, and no one assumes to say how the accident occurred, or what care or precaution the deceased took to prevent the same. Whether he fell from the upper platform by carelessly going too near its edge, or in attempting to jump across the open space to the lower platform, whether he fell from the lower platform by reason of some careless act, or what caused him to fall, is left entirely to speculation. If we assume that the open space in question had habitually been covered, up to within a week or a week and a half of the happening of the accident, it does not aid the plaintiff, because that fact does not tend to prove that plaintiff's intestate did not know, or in the exercise of ordinary care and prudence could not have known, the exact condition as it existed at the time of the accident, for it appears that he had ample opportunity to know its condition. The brother of the intestate testified:

"Those planks had been there ever since I went to work there, in September. * * * I don't know whether they were there the night of the accident or not. * * * I went over the next morning about 11 or 12 o'clock. * * * There was no plank over the hole then. The whole space was open. * * * I can't state whether those planks were loose planks that were there or not. The planks were laid off onto the westerly platform. They were swung right around, maybe one foot from the hole. Both ends were swung a little. * * * Afterwards I looked to see whether they were loose planks, and discovered one end laid on a timber; another onto another piece of planking running from the platform onto another piece of timber. They were not nailed onto planks or timbers. * * * I couldn't tell you as to whether they [the planks] covered the whole opening there. I can't tell exactly what they did cover. * * * I don't know when they were moved. I don't know whether they were not moved immediately after the accident,— whether they were in that situation before the accident, I don't know. Not within a week and a half or a week. I don't know for a week and a half where they were. I had been away."

The witness testified, in effect, that, upon prior occasions when he and the deceased had raked ice together, they walked from the lower to the upper platform, and from the upper to the lower platform, as necessity or convenience required; but there is nothing in the evidence to indicate that this was the purpose of the deceased, or that he was attempting to go from one platform to the other when he fell into the open space and was drowned. In fact, as we have seen, the evidence of the brother, the only witness who speaks upon the subject, is to the effect that upon the night in question there was no necessity for going upon the upper platform, because the rack at that point did not need raking; and there was no necessity for going upon the lower platform, because from it ice could not be raked.

On cross-examination of the witness Abram Fralick, who had been in the employ of the defendant for a considerable time prior to the accident, and who is familiar with the flume and the manner of removing ice from the racks, testified:

"I don't know of his [the deceased] going out that evening to assist anybody. Don't know whether he did or not. But on prior occasions that winter he was out there with me perhaps two or three different times in the daytime. I presume the flume was in the same condition at the time he assisted me

as it was the night he was drowned. So far as that is, concerned, I don't know. I don't know of any change being made in that flume or platform from the time I know he assisted me until he was drowned."

This evidence is certainly important; being given by a carpenter and millwright in the employ of the defendant, and who was called by the plaintiff.

The evidence, interpreted most favorably to the plaintiff, so far as the question of contributory negligence is concerned, is: That the deceased was entirely familiar with the flume; understood fully how it was constructed; understood perfectly how to perform the work required of him; knew and appreciated the danger incident to its performance; knew that a certain open space (one of many) had been covered with planks during the time of his employment, until a week or a week and a half before the accident, but whether it was covered after that does not appear. That on the night in question (a clear, moonlight night) he took his lighted lantern and went out upon the flume in the performance of his duty. That he slipped and fell, or in some manner got into the open space, and was drowned. The evidence shows that the structure upon which the plaintiff's intestate was working was an extremely dangerous and hazardous place to work upon. The caps (so called) and the platforms were frequently slippery,—so much so that the men sprinkled ashes upon them, and were instructed so to do, as a precaution against accident. Starting at a point on the north of the branch flume where it is intersected by the main flume, and going south, are four caps, each only 12 inches wide, separated by five open spaces each 2 feet 2 inches wide; and in addition there are the upper and lower platforms, both adjacent to open water, one of which is on a level with the top of the structure, and around which there is no rail or other protection. With this situation the plaintiff's intestate was familiar,—quite as familiar as any of the officers of the defendant; and so it must be conceded that no recovery could be had on account of his death unless there is proof to support the proposition that the space between the upper and lower platforms had been covered to within so short a time of the accident that plaintiff's intestate had a right to assume that it was covered at the time of the accident, and had no knowledge to the contrary, and was therefore not called upon to look or make any examination to determine the true situation. There is no such proof. For aught that appears, the situation had not changed for a week or ten days prior to the accident; for aught that appears, the deceased was fully acquainted with the situation as it existed at the time he met his death; and, as we have seen, there is no evidence tending to show how the accident happened, what precautions, if any, the deceased took to prevent it, whether it resulted from his own carelessness or otherwise. The plaintiff's case upon this question may be illustrated in this way: An employé is working in a shop, the floor of which is made up of a series of platforms, with open spaces intervening, which condition is apparent and is fully known to the employé. On an occasion the employer causes an additional open space to be made. A week or a week and a half afterwards the employé, who during the intervening time has full opportunity to know the changed situation, and there is no proof he

did not know it, in the performance of his work falls into such additional open space and is killed. How he fell, what caused him to fall, whether at the time he was careless or exercising ordinary care and prudence, do not appear. Under such circumstances, we think it clear that freedom from contributory negligence on the part of the deceased would not have been established. In the case at bar the jury was permitted to find, and in effect did find, that the open space in question was covered with planks immediately prior to the accident, or up to a time so near to it that the deceased did not know, and could not have known by the exercise of reasonable care and prudence, of their removal, and that such planks were removed and floated to the side of the open space by the action of the water rising in the flume, which resulted because of the failure of the defendant to securely fasten them in place. There is no proof of those facts. There is no proof that the open space had not been covered for a week or ten days prior to the accident. There is proof tending to show that the deceased had full opportunity to know the exact situation. There is no proof that the deceased did not know the situation as it existed at the time of the accident. There is proof that he had opportunity to know it. There is no proof tending to show that the planks were moved by the action of the water, except the fact that they lay on the edge of the platform, alongside the open space. In fact, there is no evidence to show that upon the occasion in question the water did rise above the lower platform sufficiently to move the planks. If we assume that the planks covered the open space immediately prior to the accident, under the proof it is quite as reasonable to suppose that they were moved by the deceased or by some third party as that they were moved by the action of the water. At best, it is only supposition. The jury was also permitted to find, and must have found, that the plaintiff's intestate did not know that the open space was uncovered. There is no evidence to support such finding, unless it can be inferred from the fact that the deceased fell into the open space. On the contrary, the evidence tends to show that the deceased had full opportunity to know that the space was uncovered, because it is uncontradicted that it was a bright, clear, moonlight night, and a lighted lantern was hanging within 20 feet of the place in question, and he had opportunity to know during the early part of the night, and each day prior to the accident, the exact condition of the flume.

In Weston v. City of Troy, 139 N. Y. 281, 34 N. E. 780, the headnote is as follows:

"In an action for a personal injury, based on defendant's negligence, to authorize a recovery absence of negligence on the part of the plaintiff contributing to the injury must be shown, either by direct proof or by circumstances. No presumption arises from the happening of the injury, and proof of defendant's negligence, that plaintiff was free from blame."

In Whalen v. Gaslight Co., 151 N. Y. 70, 45 N. E. 363, the rule is laid down as follows:

"In actions for damages for a personal injury, the absence of negligence on the part of the plaintiff contributing to the injury must be affirmatively shown by the plaintiff. No presumption of freedom from such negligence arises from the mere happening of an injury."

We are, of the opinion that within the authorities, and under the circumstances disclosed by the evidence in this case, the plaintiff has wholly failed to meet the burden of proving that her intestate was free from contributory negligence. We think the evidence in this case also fails to establish actionable negligence on the part of the defendant. All risks of the employment which were obvious and apparent to the deceased were assumed by him, and for any accidents resulting on account of such risks the defendant is not liable. "A servant who enters upon an employment from its nature hazardous assumes the usual risks and perils of the service, and of the open, visible structures known to him, or which he must have known had he exercised ordinary care and observation." Williams v. Railroad Co., 116 N. Y. 628, 22 N. E. 1117; Appel v. Railroad Co., 111 N. Y. 550, 19 N. E. 93; Gibson v. Railway Co., 63 N. Y. 449. The defendant had a perfect right to construct its flume or flumes in the manner in which it did, and to maintain and operate them as constructed, provided only that the danger to persons working thereon, incident to such construction and employment, was open and visible, and not the result of latent defects. When the complaint in this action was prepared, it was evidently the theory of the plaintiff that the defendant was liable for not having constructed its flume in some other or different manner than it did. The allegation is:

"That said flume was unguarded, and there was no suitable platform or place on which the deceased might stand with any degree of safety in performing said work. The same said flume was unguarded, uncovered, unnecessarily, and left and remained in that condition for several years last past. That the deceased, in the performance of his labors and his duties as such employé, was obliged to stand on the crossbeams of said flume, and reach over and down into the racks for the purpose of raking out the said ice. That the night was cold, and the beams were icy and slippery, and, being only about from six to eight inches wide, did not furnish a reasonably safe place on which deceased could stand while he performed the work which he was directed to do. That while performing said labor, and endeavoring to stand upon said beams for the purpose of so doing, the deceased slipped and fell from said beams on which he was standing, into the water, and was drowned."

Clearly, if only those allegations had been proven, no recovery could have been had, because the beams, their character, the danger, the entire situation, were obvious,—were as apparent to the deceased as to the defendant. Such risks were assumed by the deceased, and for injuries resulting therefrom the defendant would not be liable. Apparently, this theory was abandoned upon the trial, and a recovery was sought solely upon the ground that the open space 2 feet 2 inches wide between the two platforms was made or permitted by the defendant suddenly, without the knowledge of the deceased, and that he was sent upon the flume without having been informed of the changed condition, and under such circumstances that he could not have known of the same in the exercise of ordinary care and prudence, and that his death resulted from falling into such open space, without knowing or having the means of knowing that it was there. Clearly, if such a state of facts has been proven, actionable negligence would have been established, but the evidence falls far short. Several witnesses called by the defendant testified that the open space between

the two platforms had never been planked or covered; that the planks found near were for an entirely different purpose.   But assuming that the jury was justified in finding that such space had been covered at some time, as testified to by plaintiff's witness, there is no proof tending to show when such covering was removed, or how it was removed. There is no evidence tending to show that it had been removed for such length of time prior to the accident that the defendant, in the exercise of ordinary care and prudence, should have known of it.   As we have seen, whether such planks were removed by the action of the water, or whether by the deceased or some third party, is purely a matter of speculation.   Clearly, if the planks were removed during the early part of the night of the accident, without the knowledge of the defendant, it would not be chargeable with negligence.   There is an entire failure of proof tending to show that the defendant was in any way responsible for the removal of the planks, in case they were removed.   The broad contention of the defendant is that this open space into which the plaintiff's intestate fell had never been covered, to the knowledge of the intestate, during the three years which he was employed by the defendant.   If so, as we have seen, the risk thus visible and obvious was assumed by the deceased.   The position of the plaintiff is, and the proof tends to show, that the open space was covered during the time of the employment of the deceased, up to within a week or a week and a half of the accident, and that after the accident the space was uncovered.   The proof there stops.   It is not shown whether the covering was removed one hour or one day previous to the accident.   It is not shown how it was removed.   It is not shown that the defendant knew of its removal, or that it was removed under such circumstances that it ought to have known of the fact.   The conclusion is reached that the plaintiff has failed to establish actionable negligence on the part of the defendant.

Attention has been called to numerous exceptions to the rulings of the court upon the admission or rejection of evidence, and to the charge and refusals to charge as requested.   Having reached the conclusion above indicated upon the two main propositions in the case, we deem it unnecessary to consider the exceptions so taken.   It follows that the judgment and order appealed from should be reversed, and a new trial granted, with costs to the appellant to abide event.

Judgment and order reversed, and new trial ordered, with costs to the appellant to abide event.

ADAMS, P. J., concurred.   SPRING, J., concurred in result, upon the ground that there is not sufficient proof of defendant's negligence. WILLIAMS and LAUGHLIN, JJ., concurred in result, upon the same ground, and also that the risk was assumed.